IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2025 Session

**KIMBERLY SUE SPERANZA v. SCOTT MICHAEL SPERANZA**

**Appeal from the Chancery Court for Williamson County**
**No. 21CV-50618     Michael Binkley, Judge**

_____

**No. M2024-00347-COA-R3-CV**

_____

In this divorce case, Appellant/Wife appeals the trial court's denial of her Tennessee Rule of Civil Procedure 59.04 motion to alter or amend the final decree of divorce. Although Wife and Appellee/Husband tendered proposed final decrees and orally announced their consent to be divorced and to divide the marital estate, they did not file a written property-settlement agreement. In her Rule 59.04 motion, Wife asserts, *inter alia*, that the parties did not come to an agreement concerning the division of two marital assets, *i.e.* stock in Husband's company, and funds held by the trial court Clerk. In the absence of such agreement, Wife contends that the trial court erred in entering its final decree and in the division of the disputed assets. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Adrian H. Altshuler and Caroline Beth Altshuler, Franklin, Tennessee, for the appellant, Kimberly Sue Speranza.

Helen Sfikas Rogers and Laura Schumacher Blum, Nashville, Tennessee, for the appellee, Scott Michael Speranza.

**OPINION**

**I. Background**

The parties were married for 21 years and have two children (who reached majority during this litigation). During the marriage, Wife/Appellant (age 58) was primarily a homemaker. At the time of the divorce, Husband/Appellee (age 57) was the majority

owner of InsuranceAssist, Inc., a company which he founded during the marriage.

Wife filed a complaint for divorce on July 19, 2021. Husband filed an answer and counter-complaint. The subsequent proceedings were prolific and contentious. As relevant here, trial was set for April 17 through 21, 2023. On the third day of trial, April 19, 2023, the parties announced the terms of their settlement to the court, *see infra*. The parties were declared divorced and were instructed to prepare the final decree containing the particulars of their settlement for entry by the trial court. To that end, Husband submitted a proposed decree to Wife, but she refused to sign it.

On May 5, 2023, Husband filed a motion to enter a final decree, wherein he stated his understanding of the disputed issues as follows:

> b. Shareholder Agreement: Wife is requesting that the Shareholder Agreement of InsuranceAssist, Inc. be provided to her by May 3, 2023. Obviously, this date has passed. However, Husband is agreeable to providing Wife with a copy of the current Shareholder Agreement upon entry of the Final Decree of Divorce, which she is required to sign under the terms of the Final Decree of Divorce.

***

> d. Funds in Clerk's Office: The announcement of the parties' agreement to the Court was that "Ms. Speranza is receiving all the cash that's in the Clerk's office." It was further announced "That consists of $1,959,017[…] The other piece in the clerk's office is $1,409,927." (These figures would total $3,368,944.) It is now known that those figures were in error, as they did not take into account $130,000 which had been paid from the funds in the Clerk's office by Court Order to Wife's attorneys, and $10,000 which had been paid to the parties' joint expert, Chris Lovin. […] Wife is now requesting that Husband pay her one-half of this sum, which Husband will not agree to do. […]

Attached as Exhibit C to Husband's motion was his proposed final decree.

On May 18, 2023, Wife filed a response to Husband's motion and a counter-motion, asking the trial court to enter her proposed final decree. In her motion, Wife identified the following points of disagreement:

> (1) Ms. Speranza requests that […] Mr. Speranza provide her with a copy of the current Shareholder Agreement and that protective language be included in the Final Decree against dilution of shares, audited financial reporting of the company's health annually. She would also request that the Shareholder Agreement have the standard minority shareholder agreement language with

information rights and that any Shareholder Agreement to be signed by Ms. Speranza contain commercially reasonable protections for the Trust as a minority shareholder, including without limitation, language requiring the approval by the InsuranceAssist, Inc. shareholders other than Husband and including Trust of transaction(s) between InsuranceAssist, Inc. and Husband or his affiliates.

\*\*\*

(3) Ms. Speranza requests that the $100,000 to John Hollins, Jr., the $10,000 to Chris Lovin […] and the $30,000 to Ms. Story be divided equally between the parties as explained below […] [with regard to the funds on deposit in the Clerk's office.]

On June 1, 2023, the trial court heard the parties' cross-motions and entered a written order outlining its rulings from the June 1st hearing. In relevant part, the order provides:

2. InsuranceAssist, Inc. Shareholder Agreement and business language — Wife requested that Husband effectuate certain transfers within thirty (30) days of the entry of the Final Decree of Divorce, and Husband agreed to this revision in the Final Decree. However, Husband did not agree to the inclusion of the additional language proposed by Wife on pages 9 and 10 of her proposed Final Decree of Divorce[, *see infra*]. The Court found that this proposed language from Wife was not part of the agreement of the parties and shall not be included in the Final Decree of Divorce. Also, Husband provided Wife with the amended InsuranceAssist, Inc. Shareholder Agreement through counsel at the hearing.

\*\*\*

4. Funds held by the Clerk and Master — Wife was awarded all funds held by the Clerk and Master from the sale of the real properties located at 0 Kinnard Springs Road in the amount of $1,409,927.95 and 3301 Running Springs Court in the amount of $1,959,017.64 pursuant to the announcement of counsel at the hearing on April 19, 2023. Included in those sums was $140,000 already disbursed to Wife's counsel for her attorney's fees and expert fees in this case, which had not yet cleared her attorney's accounts. Wife argued that she should be reimbursed by Husband for one-half of $140,000. The Court found that the $140,000 had already been awarded to Wife in the form of attorney's fees paid to her counsel and that she was not entitled to any reimbursement for same.

\*\*\*

- 3 -

ORDERED, ADJUDGED and DECREED that the Final Decree of Divorce to be submitted by the parties shall include that the Husband shall make a corporate resolution to convert 500,012 of Husband's common shares of InsuranceAssist, Inc. into non-voting shares to be transferred to Wife within thirty (30) days of the entry of the Final Decree of Divorce, and that Wife shall have 30 days from the entry of the Final Decree of Divorce to transfer the shares awarded to her into the family trust created by her pursuant to the Final Decree of Divorce; and, it is further,

\*\*\*

ORDERED, ADJUDGED and DECREED that Wife shall be awarded the funds being held by the Clerk and Master from the sale of the real properties located at 0 Kinnard Springs Road and 3301 Running Springs Court, but shall not be awarded any reimbursement for the $140,000 already paid to her attorneys from same; and, it is further,

\*\*\*

ORDERED, ADJUDGED and DECREED that the parties are hereby directed to file an agreed Final Decree of Divorce pursuant to the terms of this Order.

On June 12, 2023, the trial court entered Husband's proposed final decree (the "Final Decree"), which was signed by counsel for both parties.

On July 11, 2023, Wife filed a Tennessee Rule of Civil Procedure 59.04 motion to alter or amend, which Husband opposed. Following a hearing on August 10, 2023, the trial court denied Wife's motion by order of February 8, 2024. Relying on paragraph 24 of the Final Decree, discussed *infra*, Husband subsequently moved for an award of attorney's fees incurred in defending Wife's Rule 59.04 motion. By order of August 29, 2023, the trial court awarded Husband $53,044.80 in attorney's fees. Wife appeals.

## II. Issues

Wife raises the following issues for review as stated in her brief:

1. Whether the Trial Court erred in entering the Final Decree of Divorce on the ground[] of irreconcilable differences, despite that there is no written agreement between the parties reflecting those terms and provisions in detail?
2. Whether the Trial Court erred in entering the Final Decree of Divorce, despite that the oral announcement made on April 19, 2023 does not

- 4 -

constitute a binding consent judgment?

3. Whether the Trial Court erred in entering the Final Decree of Divorce, despite that there was no mutual assent on all essential, material terms pertaining to Wife's "protection on shares" in InsuranceAssist, Inc.?

4. Alternatively, if the Final Decree of Divorce is valid, whether there exists a mutual mistake on the cash disbursement of the proceeds held by the Clerk and Master's Registry that enables reformation?

5. Whether the Trial Court erred in awarding Husband his attorney's fees associated with Wife's Rule 59 Motion?

6. Whether Wife is entitled to her appellate attorney's fees?

Husband asks for an award of appellate attorney's fees and costs.

## III. Standard of Review

The issues raised in this appeal were raised first in Wife's Tennessee Rule of Civil Procedure 59.04 motion, which the trial court denied. Under Rule 59.04, a party may file a motion to alter or amend a judgment within 30 days after the entry of the judgment. Tenn. R. Civ. P. 59.04. A court may grant a motion to alter or amend when: (1) the controlling law changes before the judgment becomes final; (2) previously unavailable evidence becomes available; or (3) for sui generis reasons, a judgment should be amended to correct a clear error of law or to prevent injustice. *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998) (distinguished from the issues in *Harris v. Chern*, 33 S.W.3d 741 (Tenn. 2000)). However, "[a] Rule 59 motion should not be used to raise or present new, previously untried or unasserted theories or legal arguments." *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005). "The purpose of a Rule 59 motion to alter or amend a judgment is to prevent unnecessary appeals by providing the trial court with an opportunity to correct errors before the judgment becomes final." *Legens v. Lecornu*, No. W2013-01800-COA-R3-CV, 2014 WL 2922358, at *13 (Tenn. Ct. App. June 26, 2014) (citing *Discover Bank v. Morgan*, 363 S.W.3d 479, 489 (Tenn. 2012)).

We review a trial court's ruling on a motion to alter or amend under an abuse of discretion standard. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). Under this standard, we will not reverse the court's decision unless it "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that cause[d] an injustice to the complaining party." *Id.* (quoting *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010)). This is not an opportunity for the appellate court to substitute its judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). The "trial court's ruling 'will be upheld as long as reasonable minds can disagree as to [the] propriety of the decision made.'" *Id.* (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)).

## IV. Analysis

## A. Entry of Final Decree of Divorce
## on the Ground of Irreconcilable Differences

As set out in her brief, Wife contends that "[t]he Trial Court erred in entering the Final Decree of Divorce on June 12, 2023[,] on the ground[] of irreconcilable differences and thus ordering terms Wife did not agree to because no written, signed, notarized marital dissolution agreement was proffered to the Court for ratification." Because this issue rests on the trial court's statutory authority to enter the Final Decree, resolution in favor of Wife would require us to declare the Final Decree void *ab initio*. Husband asserts that Wife failed to raise this issue below. Indeed, Wife's Rule 59.04 motion did not seek to set aside the Final Decree *in toto*. Rather, as set out in the memorandum filed in support of her motion, Wife's assertion that the parties failed to reach a mutual agreement was limited to two marital assets, *i.e.* the InsuranceAssist stock and the funds held by the Clerk, to-wit:

> [w]hile it is undisputed that the parties verbally agreed to certain settlement terms and announced those terms in court, the final written decree goes beyond what was mutually agreed to by the parties as it relates to Wife's shareholder rights in InsuranceAssist, Inc., . . . and the value of the cash disbursement from the funds held by the Clerk.

Furthermore, at the hearing on the Rule 59.04 motion, Wife's attorney explained that Wife filed her Rule 59.04, "asking the Court to alter and amend **certain paragraphs** in the final decree" (emphasis added). So, in the first instance, the relief Wife sought at the trial level, *i.e.,* amendment of certain aspects of the Final Decree, is not the same relief she seeks in this Court (through her first two appellate issues), *i.e.* a holding that the Final Decree is void *ab initio* because the trial court lacked authority to enter it. Furthermore, Wife's Rule 59.04 motion does not mention the ground of irreconcilable differences. Now, on appeal, she asserts that, in the absence of a written agreement, the trial court was precluded from granting a divorce on that ground. Notwithstanding these inconsistencies, in the interest of full adjudication of the appeal, we will address Wife's substantive argument.

As stated in the Final Decree, the trial court "declared [the parties to be] divorced by the Court at the hearing on April 19, 2023 on the ground[] of irreconcilable differences." The trial court made no finding of fault. On appeal, Wife asserts that, in the absence of a written property-settlement agreement between the parties, the trial court was without authority to enter a Final Decree of divorce on the ground of irreconcilable difference. In support of her argument, Wife cites Tennessee Code Annotated section 36-4-103(b), which provides, in relevant part:

> (b) No divorce shall be granted on the ground of irreconcilable differences unless the court affirmatively finds in its decree that the parties have made adequate and sufficient provision by written agreement . . . for the equitable settlement of any property rights between the parties. . . .

- 6 -

In response, Husband cites Tennessee Code Annotated section 36-4-129, which provides, in relevant part, that:

> The court may, upon stipulation . . . of any ground of divorce pursuant to § 36-4-101, . . . if a divorce is to be granted on the grounds of irreconcilable differences, declare the parties to be divorced, rather than awarding a divorce to either party alone.

Before turning to the statutes, we reiterate the well-established principles of statutory interpretation. When reading "statutory language that is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman Chemical Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). "[W]e presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing." *SunTrust Bank v. Burke*, 491 S.W.3d 693, 695 (Tenn. Ct. App. 2015), *perm. app. denied* (Tenn. June 15, 2015) (quoting *Lind v. Beaman Dodge*, 356 S.W.3d 889, 895 (Tenn. 2011)).

In the first instance, Wife's reliance on section 36-4-103(b) is misplaced. As noted above, the trial court did not **grant** a divorce to either party; it **declared** the parties to be divorced. Accordingly, section 36-4-103(b), which contemplates a "divorce . . . **granted** on the ground of irreconcilable differences," is not applicable. Rather, section 36-4-129, which authorizes the trial court to **declare** the parties to be divorced on any stipulated ground, applies as long as there was, in fact, a stipulation as to the ground(s). Before turning to that question, we briefly note that, "A trial court's decision to declare parties divorced, rather than granting a divorce to one of the parties, is reviewed under an abuse of discretion standard." *Ward v. Ward*, No. M2012-01184-COA-R3-CV, 2013 WL 3198157, at *13 (Tenn. Ct. App. June 20, 2013). Once any ground for divorce has been stipulated or proven, "'the trial court may . . . declare the parties divorced; such choice is left to the trial court's discretion.'" *Truman v. Truman*, No. E2009-00237-COA-R3-CV, 2010 WL 323066, at *6 (Tenn. Ct. App. Jan. 28, 2010) (quoting *Watson v. Watson*, No. W2004-01014-COA-R3-CV, 2005 WL 1882413, *4 (Tenn. Ct. App. Aug. 9, 2005)).

As noted above, by its plain language, section 36-4-129 requires the divorcing parties to stipulate to at least one of the statutory grounds outlined at section 36-4-101. Here, the parties clearly stipulated to the ground of irreconcilable differences. Tenn. Code Ann. § 36-4-101(a)(14). Both parties' proposed final decrees include the following language: "The parties were declared divorced by the Court at the hearing on April 19, 2023 on the grounds of irreconcilable differences . . . ." At the April 19, 2023 hearing, Virginia Story, Wife's attorney, announced to the trial court:

> Your Honor, we're going to ask that Your Honor declare these parties

divorced, and we're going to do a final decree of divorce. . . .

***

We were going to do a final decree of divorce and let you divorce them today. . . . The divorce will be on the ground[] of irreconcilable differences. Do we need to put in the—we'll just put in the order by stipulation.

With the parties' stipulation on the ground of irreconcilable differences, section 36-4-129 authorized the trial court to **declare** the parties divorced. Section 36-4-129 does not require a written property-settlement agreement as a condition precedent to the declaration of divorce. Here, the Final Decree did exactly what Wife's attorney asked the trial court to do, *i.e.* it "**declare[d]** these parties divorced . . . on the grounds of irreconcilable differences . . . by stipulation."

### B. "Binding Consent Judgment"

As set out in her brief, Wife asserts that

no binding consent judgment exists because not all of the terms of the parties' oral global settlement was announced on the record on April 19, 2023. As a result, when the parties later attempted to reduce oral statements to writing and disagreed on essential, material terms, the Trial Court lacked authority to enter the Final Decree because there was no "meeting of the minds" to create an enforceable agreement.

In support of her argument, Wife relies on the Tennessee Supreme Court's opinion, ***Harbour v. Brown for Ulrich***, 732 S.W.2d 598 (Tenn. 1987). As the Tennessee Supreme Court has explained:

[In ***Harbour***,] appellant sought specific performance of an alleged real estate contract and the enjoining of a threatened foreclosure action under an existing deed of trust. The appellant filed a cross-complaint for judgment on the note secured by the deed of trust. On the day of trial, the parties announced that they had reached an agreement, the terms of which were not announced to the court. Prior to entry of judgment, the appellee repudiated the terms of the agreement. Holding that the agreement was not enforceable, this Court stated that although the resolution of disputes by agreement is encouraged, "a valid consent judgment can not be entered by a court when one party withdraws his consent and this fact is communicated to the court prior to entry of the judgment." [***Harbour***, 732 S.W.2d.,] at 599 (citing ***Van Donselaar v. Van Donselaar***, 249 Iowa 504, 87 N.W.2d 311 (1958)). The Court in ***Harbour*** further held that "consent must exist at the very moment

the court undertakes to make the agreement the judgment of the court." *Harbour*, 732 S.W.2d at 599 (quoting *Burnaman v. Heaton*, 150 Tex. 333, 240 S.W.2d 288 (1951)). Thus, "until entered by the court, the matter being the question of an agreement between the parties, either party may repudiate the agreement because of an actual or supposed defense to the agreement." *Harbour*, 732 S.W.2d at 600.

*Ledbetter v. Ledbetter*, 163 S.W.3d 681, 684 (Tenn. 2005). Relying on the *Harbour* rule, Wife asserts that, after the parties announced their settlement at the April 19, 2023 hearing, she and Husband continued to dispute certain material terms concerning the division of the stock and the money held by the Clerk. In refusing to sign Husband's proposed final decree, Wife asserts that she repudiated any oral agreement between the parties. Thus, under the *Harbour* rule, Wife asserts that the trial court was not authorized to enter a consent order, *i.e.*, the Final Decree.

In *Environmental Abatement, Inc. v. Astrum R.E. Corp*., 27 S.W.3d 530 (Tenn. Ct. App. 2000), this Court carved an exception to the *Harbour* rule. In its *Ledbetter* opinion, the Tennessee Supreme Court acknowledged the *Environmental Abatement* exception as follows:

> Citing to language in *Harbour*, the Court of Appeals[, in *Environmental Abatement*,] noted an exception to the general rule that consent must exist at the time of judgment. That exception would allow a court to enter a consent judgment "which merely documents an earlier agreement even where consent does not exist at the time of entry of the written order." *Id*. at 538-39. The exception provides further that when the terms of an agreement are announced or stipulated in open court, a judge may later enter a consent judgment based on that agreement regardless of a party's repudiation between the time of the announcement and the judgment. *Id*. at 539. This exception is rooted in the language in *Harbour*, which states that "'[t]he power of the court to render a judgment by consent is dependent on the existence of the consent of the parties at the time the agreement receives the sanction of the court or is rendered and promulgated as a judgment.'" *Harbour*, 732 S.W.2d at 599 (quoting 49 C.J.S. Judgments § 174(b)).

*Ledbetter v. Ledbetter*, 163 S.W.3d 681, 684-685 (Tenn. 2005). The *Environmental Abatement* exception "applies to agreements made in open court, on the record where the detailed terms of the agreement are presented to the court, accepted by the court, and preserved by transcript or other acceptable record of court proceedings." *Environmental Abatement*, 27 S.W.3d at 539. In arguing this issue, Wife acknowledges the *Environmental Abatement* exception. As stated in her brief, "An exception to this bright line [*Harbour*] rule is when all of the terms of the agreement are read into open court and the chancellor asks the parties whether they consent to the agreement, then the agreement

is enforceable notwithstanding subsequent disavowal by a party" (citations omitted). *See REM Enterprises, Ltd. v. Frye*, 937 S.W.2d 920, 922 (Tenn. Ct. App. 1996), *perm. app. denied* (Tenn. Jan. 6, 1997) (holding that, where the terms of the agreement were read in open court and the chancellor asked the parties whether they consented to the agreement, the agreement was enforceable notwithstanding subsequent disavowal by the appellant). If the required criteria are met, then the *Environmental Abatement* exception applies to allow entry of the Final Decree despite Wife's alleged withdrawal of her consent. We turn to that question.

We have reviewed the transcript of the April 19, 2023 hearing. Over the course of approximately 20 pages, the parties' attorneys announced their clients' agreement regarding numerous marital assets and debts. The trial court asked several questions, which the attorneys clarified. First, we conclude that the parties' announcement satisfies the *Environmental Abatement* criteria that the parties' agreement be "made in open court, on the record . . . and preserved by transcript . . . ." Notwithstanding the discussion below concerning the stock and the funds held by the Clerk, when taken as a whole, we conclude that the parties' announced agreement is sufficiently definite to satisfy the *Environmental Abatement* criterion that the parties must present "the detailed terms of the agreement." Again, this conclusion is based on the global agreement and applies only to the question of whether the trial court had authority to enter the consent decree based on application of the *Environmental Abatement* exception; we will address Wife's contentions concerning the two disputed assets below.

Concerning the remaining criteria for application of the exception, at the end of the April 19, 2023 hearing, the trial court "accepted" the parties' agreement when it stated: "I believe, based upon what I know about this case, that it's an excellent settlement for both of you. So I'm glad it got resolved." Although not specifically required under the holding in *Environmental Abatement*, as was the case in *REM Enterprises*, before accepting their agreement, the trial court separately asked each party whether he or she was satisfied with the settlement announced to the court. Both answered yes. The trial court went on to ask:

> THE COURT: Do either one of you have any questions that you would like to ask your lawyer before we leave here? I want to make sure you feel comfortable with it. Nobody really likes a full and final settlement. There's always something they wish they could have gotten more of. There's no doubt about that, and I understand that. But do you have any questions at all before we leave here today that you would like to ask your lawyers about any of the division of the property, the terms of the agreement, that type thing, before we leave here today? Ms. Speranza?
>
> MS. SPERANZA: No.
> THE COURT: All right. Mr. Speranza?
> MR. SPERANZA: No.

- 10 -

Ms. Speranza, are you satisfied with the work that has been done by your lawyers in representing you throughout this case and in finally reaching a settlement that you are satisfied with in this case?
MS. SPERANZA: Yes.

From the foregoing, the required criteria for application of the ***Environmental Abatement*** exception were met in this case. As such, even if we assume that Wife withdrew her consent after the April 19, 2023 announcement, the trial court was nonetheless vested with authority to enter the Final Decree.

Having determined that the trial court was vested with authority to enter the Final Decree of divorce on the ground of irreconcilable differences, we turn to the issue of whether the Final Decree reflects the parties' agreement concerning the two disputed assets. Specifically, Wife asserts that, "The final written decree goes beyond what was mutually agreed to by the parties as it relates to Wife's shareholder rights in InsuranceAssist, Inc., . . . and the value of the cash disbursement from the funds held by the Clerk." We will address each of the disputed assets.

## 1. InsuranceAssist Stock
2.

As to the stock, Wife contends that she and Husband never had a "meeting of the minds" concerning certain material terms regarding the division of the asset. As discussed below, she specifically asserts that the parties never agreed: (1) that Wife would receive "non-voting" stock; (2) as to what constituted "commercially reasonable protections" for Wife's award of InsuranceAssist stock; and (3) as to the applicable InsuranceAssist Shareholder Agreement.

We begin with the April 19, 2023 proceedings. As noted above, during a break at the April 19, 2023 hearing, the parties allegedly reached a settlement agreement. The parties made hand-written notations on a piece of paper, including, in relevant part, the following concerning the InsuranceAssist stock:

(performance shares)
protection on shares (unless shares as directed by an unrelated 3rd party [or person])
(internal dilutions)

Neither party asserts that the paper constitutes a written property-settlement agreement; from our review of the exhibit, we agree. Regardless, the parties did not mention this paper until the hearing on Wife's Rule 59.04 motion, where it was admitted as exhibit 6.

Turning to the April 19, 2023 hearing, the parties made the following announcement concerning the InsuranceAssist stock:

> MS. STORY[, Wife's Attorney]: Wife will receive 500,000 shares of InsuranceAssist, plus 11 shares 11.33 shares to be held in trust for the children. We will work on this language with Vic Alexander [Wife expert CPA] and Tom Price [Husband's expert]. There is some specific language we're going to use for non-dilution of shares except as it relates to a third-party performance contract. So if a third party comes in and infuses cash and we need to address—that would be a good thing for the company. Then whatever is diluted would be equal across the board between Husband and Wife so that neither one of them—
> MS. ROGERS[, Husband's attorney]: No. I think you misspoke.
> MS. STORY: You can explain it better?
> MS. ROGERS: No. I think you just misspoke. If a venture capitalist comes in and is part of that, they issue performance levels—we'll give you more stock in the new company if you hit certain targets and that could possibly dilute. That wouldn't count, but any internal dilution or third party that came in and just didn't make those performance requirements, there—her shares would not be diluted to any extent more than his would be. In other words, if someone comes in, it would be the same percentage pro rata. I think that's the right—
> MS. STORY: Mr. Alexander, can I—did I say—
> MS. ROGERS: Does that make sense? Did I say it the right way?
> MR. VIC ALEXANDER: I believe so. The thought process, Your Honor, was that this company may have some outside equity come in, and it's not unusual for outside equity to have performance measures or incentives for management. So it's likely that if that happens, there will be management incentives and additional management shares, and those won't be counted toward that calculation.
> THE COURT: I see. Thank you.
> MS. STORY: And everything else would be antidilution against so that—
> MR. VIC ALEXANDER: Pro rata against his shares.
> MS. ROGERS: Pro rata.
> THE COURT: I understand.
> MR. VIC ALEXANDER: If they get diluted, they both get diluted in the same fashion.
> THE COURT: I see.
> MS. STORY: And we will work on that language in the final decree when we submit it.
> THE COURT: Thank you. And thanks for the explanation, Mr. Alexander. That helps. Thank you.
> MR. VIC ALEXANDER: Yes, sir.

THE COURT: All right. Next.
MS. STORY: So total of 511 shares point 33 go to Wife, but 11.33 shares of those will be in the kids' names.
MR. VIC ALEXANDER: 500,000.
MS. STORY: 500,000 shares.
THE COURT: Okay.

At the time it entered the Final Decree, not only had the trial court heard the parties' April 19, 2023 oral announcements, but it also had: (1) reviewed the parties' competing motions for entry of a final decree, with their proposed decrees attached; (3) held a June 1, 2023 hearing on the competing motions for entry of a final decree; and (4) entered an order outlining its rulings from the June 1st hearing. The question, then, is whether the proceedings and documents available to the trial court adequately demonstrate the terms of the parties' agreement on the InsuranceAssist stock and, if so, whether the parties' intent "was appropriately memorialized in the written order[]." *In re Creswell*, 238 S.W.3d 263, 269 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. June 7, 2007). In *Creswell*, the trial court denied the decedent's son's request to set aside the settlement, and he appealed to this Court. Similar to the issue Wife raises here, in *Creswell*, the son asserted that the terms of the agreement were ambiguous and vague because reference was made to "miscellaneous items in boxes," and because two accounts awarded to him were not specifically mentioned in the announcement. *Id.* at 268-69. In affirming the trial court's denial of the motion to set aside the settlement, we held that, "The parties' intent is clear, and was appropriately memorialized in the written Orders. The terms of the settlement were very definite and specific[, . . .] and there has been no ambiguity shown that would invalidate the agreement. *Id.* at 269. The same is true here.

In relevant part, the Final Decree provides:

10. **BUSINESS**. Husband owns 1,514,102 common shares and 163,000 warrants in InsuranceAssist, Inc., which includes both the TotalCare and the Healthlock brands. Husband shall retain all of the common shares, vested warrants, and unvested warrants in InsuranceAssist, Inc. in his individual name with the exception of 500,012 non-voting shares which shall be placed in a family trust to be created by Wife at her expense, for the benefit of Wife and the parties' children. . . . Of these shares, 500,000 shall be designated for the benefit of Wife, and 12 shares shall be designated for the benefit of the parties' children under the terms of the trust. The children . . . shall be named contingent beneficiaries of the shares held in trust for the benefit of the Wife. These 500,012 shares are equal to 29.81% of the marital estate's full equity ownership of 1,514,102 common shares and 163,000 warrants. For the purposes of preventing dilution of the family trust's interest, except as otherwise provided herein below, in the event that any common shares in InsuranceAssist, Inc., or any subsidiaries, are issued to Husband in the future,

- 13 -

either directly or through any other means, including methods of indirect ownership or beneficial interests, Husband agrees to relinquish 29.81% of such issuance, and an equivalent amount of non-voting equity or debt interests in the same class will be awarded to the family trust in which Wife's and the children's shares are held within 30 days from the date of the Final Decree. *By way of example and for the sake of clarity, if Husband was to be issued 100,000 common shares of equity in InsuranceAssist, Inc., then Husband would relinquish 29,800 of such shares back to the company, and the company would issue 29,800 non-voting common shares to the family trust in which Wife's and the children's shares are held*. Notwithstanding the foregoing, excluded from the above dilution protection mechanism, are any issuances from a management incentive pool (or similar or other performance-based issuances) which may be required and created as part of or following a third-party investment in the Company. Other than the 500,000.00 shares to Wife and the 12 to the children in Trust, Husband is awarded all remaining common shares held in his name being 1,014,090 common shares and any vested and unvested warrants in InsuranceAssist, Inc., free and clear of any claim, right, title or interest of Wife, and shall defend, indemnify, and hold Wife harmless on any liability incurred as a result of Husband's ownership interest in same.

All of Husband's common shares in InsuranceAssist, Inc., are currently voting shares. Thus, Husband shall within 30 days from the date of the entry of the Final Decree propose a corporate resolution to convert 500,012 of his common shares into non-voting shares prior to transferring them to Wife and the children pursuant to this Agreement. Said 500,012 shares shall be transferred from Husband to Wife personally, and Wife shall then transfer the shares into a trust or trusts to be created by her at her expense. Wife shall cooperate in signing the InsuranceAssist, Inc. Shareholder Agreement personally and as trustee and/or beneficiary of any trust holding the shares for her benefit upon transferring the shares into the trust or trusts within 30 days from the date of the Final Decree. Wife shall receive a copy of the Amended Shareholder Agreement upon entry of the Final Decree of Divorce.

(Italics in original). As set out in her brief, Wife first asserts that, "There is no reference . . . in the oral announcement that Wife's award of stock would be relegated to a new class of non-voting shares." However, in her proposed final decree, Wife requested non-voting shares, to-wit:

- "Husband shall retain all of the common shares, vested warrants, and unvested warrants in InsuranceAssist, Inc. in his individual name with the exception of 500,012 **non-voting shares** which shall be placed in a family trust to be created by

- 14 -

Wife . . ." (emphasis added). The trial court included this language, verbatim, in the Final Decree, *see supra*.

- "Husband agrees to relinquish 29.81% of such New Securities, and an equivalent amount of New Securities (provided that any New Securities will be **non-voting**") (emphasis added). The Final Decree deviates from the proposed language and provides: "Husband agrees to relinquish 29.81% of such issuance, and an equivalent amount of non-voting equity or debt interests in the same class will be awarded to the family trust in which Wife's and the children's shares are held."

- "Thus, Husband shall within 30 days from the date of the Final Decree propose a corporate resolution to convert 500,012 of his common shares into **non-voting shares** prior to transferring them to Wife and the children pursuant to this Agreement." (Emphasis added). As set out above, the Final Decree incorporates this language verbatim.

In its order denying her Rule 59.04 motion, the trial court correctly notes that, "Former Wife's proposed divorce decree also states she was to receive non-voting shares of stock." Because her proposed final decree clearly states that Wife will receive non-voting shares, we agree with the statement in Husband's brief that the fact "[t]hat the Final Decree entered by the trial court awards Wife non-voting shares should not be a surprise to Wife."

Turning to Wife's argument that the Final Decree fails to include "commercially reasonable protections," in her proposed final decree, Wife asked for inclusion of the following language:

> For the purposes of preventing dilution of the family trust's interest, except as otherwise provided herein below, in the event that any equity securities, debt securities convertible or exchangeable for any equity securities, or any option, warrant or other right to acquire any such equity or debt securities to any person or entity in InsuranceAssist, Inc., or any subsidiaries ("New Securities") ~~common shares in InsuranceAssist, Inc., or any subsidiaries, are issued~~ to Husband in the future, either directly or through any other means, including methods of indirect ownership or beneficial interests, Husband agrees to relinquish 29.81% of such New Securities ~~issuance~~, and an equivalent amount of New Securities (provided that any New Securities will be non-voting ~~equity of debt interest~~ in the same class will be awarded to the family trust in which Wife's and the children's shares are held within 30 days from the date of the Final Decree).

(underlining and strikethroughs included in original. Strikethroughs represent language Wife wished to omit from Husband's proposed final decree, and underlined portions represent Wife's additions to Husband's proposed language). As set out in its order from

the June 1, 2023 hearing, *supra*, the trial court did not adopt some of the foregoing language, *i.e.* "The Court found that this proposed language from Wife was not part of the agreement of the parties and shall not be included in the Final Decree of Divorce." Instead, in the Final Decree, the trial court adopted the following language:

> For the purposes of preventing dilution of the family trust's interest, except as otherwise provided herein below, in the event that any common shares in InsuranceAssist, Inc., or any subsidiaries, are issued to Husband in the future, either directly or through any other means, including methods of indirect ownership or beneficial interests, Husband agrees to relinquish 29.81% of such issuance, and an equivalent amount of non-voting equity or debt interests in the same class will be awarded to the family trust in which Wife's and the children's shares are held within 30 days from the date of the Final Decree.

Recall that, in their April 19, 2023 announcement to the trial court, the parties stated that "We will work on this language [*i.e.,* non-dilution language] with Vic Alexander and Tom Price[, the parties' experts]. There is some specific language we're going to use for non-dilution of shares except as it relates to a third-party performance contract." At the June 1, 2023 hearing on their respective motions for entry of a final decree, Husband's attorney informed the trial court that the language suggested in Husband's proposed final decree, *i.e.* the language the trial court included in the Final Decree, was drafted by Messrs. Alexander and Price:

> [Ms. Helen Rogers, Husband's attorney, to the trial court]: Mr. Price is here to tell you that he and Vic Alexander met. They agreed on the language. Exhibit B to our motion is the proposed order that they came up with that says that Husband owns 1.54—or 1,514,102 common shares and warrants and it goes on to what she'll be given. And then it says, "For the purposes of preventing dilution of the family trust's interest"—because she's supposed to put the stock into trust—"except as otherwise provided below, in the event any common shares that InsuranceAssist, Inc., or any subsidiaries,are issued to Husband in the future, either directly or through any other means, including methods of indirect ownership or beneficial interests, Husband agrees to relinquish 29.18 percent of such issuance, and such equivalent amount of non-voting equity or debt interests in the same class will be awarded to the family trust in which Wife's and the children's shares are held within 30 days from the date of the final decree . . . ."
>
> THE COURT: Those are the terms set up by Mr. Alexander and Mr. Price?
>
> MS. ROGERS: Exactly as we had provided [in Husband's proposed final decree].

- 16 -

Wife does not dispute that the non-dilution language included in the Final Decree was drafted by the parties' respective experts. Nonetheless, in her Tennessee Rule of Civil Procedure 59.04 motion, Wife argues that the language fashioned by Messrs. Alexander and Price does not protect her shares in view of a 2023 amendment to the InsuranceAssist shareholder agreement. As set out in her Rule 59.04 motion:

> Counsel presented to the Court the terms of the parties' verbal agreement. Wife's 500,000 shares in InsuranceAssist were a material component of the division of the marital estate. When announcing the settlement terms, neither of the parties nor their Counsel had a copy of the Shareholders Agreement that the Final Decree would ultimately direct Wife to sign. Rather, counsel indicated that the terms of Wife's share ownership needed additional work. Specifically, indicating that anti-dilution language had yet to be finalized, but that they "will work on this language with [the experts]." . . .

> After announcing this verbal agreement, Husband proffered an amended and restated shareholder agreement to be signed only by Wife. This amended Shareholder Agreement created a separate class of non-voting stock that includes restrictions that violate public policy. The Shareholder Agreement has the potential to render Wife's shares worthless. For example, as the majority shareholder, and employee of the company, Husband has the ability to compensate himself at whatever rate he chooses, effectively enabling Husband not to pay dividends to the shareholders, including Wife. Moreover, The Shareholder's Agreement does not include a "change of control provision," a term commonly used to ensure minority shareholders or equity holders are able to sell their equity if the other shareholders sell their shares to a third party. Husband effectively has the ability to squeeze Wife out of her ownership in InsuranceAssist. Finally, Wife is prohibited from selling her InsuranceAssist shares to anyone other than existing shareholders.

> Concerning the shareholders' agreement, the Final Decree provides only that:

> Wife shall cooperate in signing the InsuranceAssist, Inc. Shareholder Agreement personally and as trustee and/or beneficiary of any trust holding the shares for her benefit upon transferring the shares into the trust or trusts within 30 days from the date of the Final Decree. Wife shall receive a copy of the Amended Shareholder Agreement upon entry of the Final Decree of Divorce.

Although the Final Decree does not provide the date of the shareholder agreement "Wife shall cooperate in signing," in her appellate brief, Wife argues that

[t]he 2023 Shareholder Agreement, which the Final Decree compels Wife to sign despite being created after the April 19, 2023 oral announcement, has a drastic effect on Wife's share of the marital property. It creates a class of non-voting shares in InsuranceAssist that have no marketability, no right of income from the company, and no ability to check the majority ownership or management from absorbing or transferring capital away from the Company.

Concerning the applicable version of the shareholders agreement, at the June 1, 2023 hearing on their competing motions for entry of a final decree, Wife's attorney stated:

[MS. STORY]: . . . We had asked for the shareholder agreement to be provided to us. The one that Mr. Alexander had—and I assume it's the one that Mr. Price has—I'm not sure, but it's December 30th of 2020. We asked in our version of the final decree that we get a copy of the current shareholder agreement.
THE COURT: Okay. What is the current—what's the date of the latest shareholder agreement?
MR. PRICE: That's the latest one that I have, Your Honor.
THE COURT: The 2020?
MS. STORY: December 30th, 2020.
MS. ROGERS: And, Your Honor, once she becomes a shareholder, then she'll sign the shareholder agreement and she'll have it. . . .

***

THE COURT: [Wife] would be entitled to receive that shareholder agreement once this [Final Decree] is signed . . . .
MS. ROGERS: Of course.

***

THE COURT: What's wrong with that?
MS. STORY: That's what we asked for.
THE COURT: What's wrong with that?

***

MS. STORY: I just wanted the answer because we believe that there was another attempt to amend the shareholder agreement before today by Mr. Speranza, so we just want to make sure that the December 30th, 2020, was the one, and that's the one we had in discovery.
THE COURT: So are you-all satisfied that the December 2020 is the last one that we have? Yes or no?

- 18 -

MS. ROGERS: He says there's a new agreement.

THE COURT: Okay.

MS. STORY: That's the one . . . . We just want to make sure that it is not trying to undercut the language of the final decree that we—that Vic and Tom have put in to make sure that she is protected. So the shareholder agreement that is in existence today is the one that we were operating under when she was awarded her 500,000 shares. We believe he's trying to do something with the shareholder agreement—a restated shareholder agreement that somehow—

THE COURT: To decrease the value of her shares? That's what you're saying essentially; right?

\*\*\*

MS. STORY: That was all, Your Honor. I just wanted to make sure that we had the [shareholder agreement] that was in existence on April the l9th when we made this announcement, because that's what we were relying on. We were relying on the December 30th, 2020, shareholder agreement, so was Mr. Price, and so was Mr. Alexander. . . .

The competing versions of the InsuranceAssist shareholder agreement were submitted as exhibits 3 and 4 at the hearing on Wife's Rule 59.04 motion. In ruling on the Rule 59.04 motion, the trial court made the following findings concerning Wife's arguments regarding the shareholder agreement:

Former Wife avers the terms of the allegedly undisclosed Shareholder Agreement [*i.e.,* the 2023 version] renders the value of Former Wife's distribution far less than what was contemplated by the parties at the time of their verbal agreement. Former Husband summarizes Former Wife's allegations concerning the Amended Shareholder Agreement tendered to her as: "(1) creat[ing] a separate class of non-voting stock; (2) improperly excludes a 'change of control' provision; and (3) improperly prohibits [Former] Wife from selling her shares of InsuranceAssist. Former Husband argues the Court has already ruled upon these arguments relating to the InsuranceAssist, Inc. shares and the Court should not disrupt its previous ruling. Former Husband further contends Former Wife cannot claim she is surprised by the shares awarded to her being classified as non-voting because her counsel stated the [December 30, 2020] Shareholder Agreement was relied upon when announcing the terms of the settlement to the Court, which also defined the type of shares Former Wife would later receive as non-voting, and Former Wife's proposed divorce decree stated she would receive non-voting shares. Similarly, Former Husband avers Former Wife was fully aware of the provisions of the Shareholder Agreement which gave Former

- 19 -

Husband control over company management and decisions because these provisions have not changed from the [December 2020] Shareholder Agreement; Former Wife shares exactly the same protections under the Shareholder Agreement as all other shareholders in the business."

(footnotes and citations omitted). From our review of the 2020 and 2023 versions of the shareholder agreement, we agree with the trial court's conclusion. Concerning the classes of stock, the December 30, 2020 shareholder agreement states that, "[T]he company has two (2) classes of common stock, which are designated Class A Common Stock … and Class B Common Stock," and "Class B Shares shall have no voting rights and Shareholders holding Class B Shares shall retain no voting power and shall not be entitled to vote on any matter except as otherwise required by law[.]" The 2023 amended and restated shareholder agreement contains the exact same language. As such, contrary to Wife's argument that the 2023 shareholder agreement created a separate class of non-voting stock, it did not. The 2023 shareholder agreement and the 2020 version contemplate the same classes of stock.

In fact, from our review of the 2020 and 2023 versions of the shareholder agreement, they are the same except for the inclusion, in the 2023 version, of a non-disparagement clause at paragraph 2.3; the addition of this paragraph does not affect Wife's award of InsuranceAssist stock. Any language that would affect her award was not changed between the two versions of the shareholders' agreement.

From Mr. Alexander's report, which was admitted as exhibit 62 at the April 19, 2023 hearing, he relied on the 2020 version of the shareholder agreement in rendering his opinion. When Mr. Alexander and Mr. Price drafted the non-dilution language that was included in the Final Decree, they clearly were operating under the 2020 shareholder agreement. This is the version of the shareholder agreement that Wife's attorney requested, *i.e.* "We were relying on the December 30th, 2020, shareholder agreement, so was Mr. Price, and so was Mr. Alexander." In short, the language drafted by Messrs. Alexander and Price, which was included in the Final Decree, was based, *inter alia,* on their application of the 2020 shareholder agreement, which is what Wife requested at the June 1, 2023 hearing. Because there is no amendment in the 2023 shareholder agreement that usurps the protections Messrs. Alexander and Price proposed, the language suggested by Wife in her proposed final decree was unnecessary to protect her award of InsuranceAssist shares, even in view of the amended shareholder agreement. For the foregoing reasons, Messrs. Alexander and Price's language, as incorporated into the Final Decree, encapsulates the agreement of the parties.

### D. Money Held by Clerk

On March 31, 2023, the trial court entered an order, which provides, in relevant part:

[T]he parties counsel determined that during the past three (3) months,

Husband has paid to his attorneys for fees an additional $30,000 beyond what Wife paid. To equalize this amount, the Clerk's office shall immediately pay to Wife's counsel's, Virginia Story Escrow the sum of $30,000 immediately upon entry of this Order. This sum shall be held in the said attorney's Escrow account for fees incurred by Wife.

The parties' respective attorneys signed the order immediately below the language, "**APPROVED AS TO ENTRY:**" (bold in original).

On April 10, 2023, the trial court entered an "Amended Agreed Order to Pay Attorney's Fees." The attorneys for both parties signed the order immediately following the language, "**APPROVED AS TO ENTRY**:" (bold in original). Substantively, the agreed order provides:

1. Mr. John Hollins, Jr.'s [*i.e.*, Wife's attorney] firm, Thompson Burton PLLC shall be paid the sum of One Hundred Ten Thousand ($110,000) Dollars immediately upon entry of this Order from the net proceeds of the 0 Kinnard Springs Road real estate sale held by the Williamson County Chancery Court pursuant to the Notice of Tender of Funds filed 3/27/2023. This sum shall be held in the law offices' Escrow account for fees incurred by Wife with the exception of $10,000 to be paid as set forth below.
2. Upon payment to Thompson Burton PLLC, Mr. John Hollins, Jr., co-counsel for Wife, shall pay to Chris Lovin's firm, LBMC, Ten Thousand Dollars ($10,000) as retainer. . . .

The fact that Wife's attorneys signed the foregoing orders charges them (and their client) with knowledge of the contents of those orders. *See, e.g., **Seaton v. Dye***, 263 S.W.2d 544, 550 (Tenn. Ct. App. 1953), *perm. app. denied* (Tenn. June 5, 1953) (holding that where "the decree was approved by [a party's] attorney[, the party] is chargeable with knowledge of its contents."). In her Rule 59.04 motion, Wife acknowledges the foregoing orders, but argues that:

[T]he parties learned that the funds available for disbursement after payments to their retained professionals was materially less than was discussed during the April 19 verbal agreement. Before the trial, the Court entered Orders regarding payment of Wife's attorney's fees, which were to be paid from the marital funds on deposit in the Clerk's Office. Pursuant to the Order entered on March 31, 2023, the amount of $30,000.00 was to be immediately paid to Wife's former co-counsel, Ms. Story, in order to equalize the amount of marital funds spent by the parties on litigation expenses. Additionally, pursuant to the Amended Agreed Order entered on April 10, 2023, the amount of $110,000.00 was to be immediately disbursed to Wife's former co-counsel, Mr. Hollins, for his fees ($100,000.00) and as a joint retainer to

Mr. Lovin, the parties' joint financial expert ($10,000.00).

Despite the previous Orders directing Wife's attorney's fees and the joint retainer to Mr. Lovin be paid from marital funds prior to commencement of the trial, the checks had yet to clear the Clerk's Register such that the total cash received by Wife was less than the amount agreed upon, as even Husband's counsel made reference to the fact that "there's sufficient money that's already been distributed for attorneys' fees" and acknowledged that Wife's counsel received "130" ($30,000 to Ms. Story per the 3/31/2023 court order and $100,000 to Mr. Hollins per the 4/10/2023 court order).

At the April 19, 2023 hearing, Wife's attorney announced:
MS. STORY [Wife's attorney]: Ms. Speranza is receiving all the cash that's in the clerk's office.
THE COURT: Okay.
MS. STORY: That consists of 1,959,017.
THE COURT: Thank you.
MS. STORY: The other piece in the clerk's office is $1,409,927. There is also an insurance check that's being deposited either today or tomorrow that was held out in escrow at Heritage Title, and that check is $31,477.56. And I know those little cents bug you, but the closing attorney just sent it to me, so I'm going to have to give you that number.
THE COURT: Absolutely. That's fine.
MS. STORY: 31,477.56. That will go to Ms. Speranza.

Just nine days before making this announcement, on April 10, 2023, Ms. Story signed (and the trial court entered) the order to pay Messrs. Hollins and Lovin from the funds held by the Clerk. Just nineteen days before making this announcement, Ms. Story signed (and the trial court entered) the order to pay $30,000.00 to Ms. Story herself. There can be no doubt that Ms. Story was aware of the orders she signed and "approved as to entry." Accordingly, Wife is charged with knowledge of the payments (and amounts thereof) that were ordered to be paid from the funds held by the Clerk. **Seaton**, 263 S.W.2d at 550; *see also* **Boote v. Shivers**, 198 S.W.3d 732, 742 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. April 24, 2006) (citations omitted) (noting the well-established rule that "knowledge obtained by an attorney during the course and in the scope of his or her representation of a particular client is conclusively imputed to the client as a matter of law"). Although Wife is charged with knowledge of the ordered payments, there is no indication that she requested information regarding the balance held by the Clerk before her attorney announced that she would "receiv[e] all the cash that's in the clerk's office." From the foregoing statements, Wife's attorney clearly was aware that there was an outstanding check from Heritage Title in the amount of $31,477.56 that was to be deposited with the Clerk, yet she failed to ensure that the recently-ordered payments from the Clerk had

- 22 -

cleared the account.  In short, contrary to Wife's assertion in her Rule 59.04 motion, there was no "mutual mistake" as to the amount of the Clerk's funds remaining for distribution to Wife.  In fact, at the end of the April 19, 2023 hearing, Mr. Hollins, one of Wife's attorney's, informed the court that, "Your Honor, the Court entered an order for 100,000 **that I'm holding for me and Virginia [Story]**, plus 10,000 for Chris Lovin" (emphasis added).  The trial court then asked Mr. Hollins the following question regarding the payment of his outstanding fees, "Are you taken care of, Mr. Hollins?"  Mr. Hollins answered, "I will. **I haven't been yet**, but I will. I will take care of Chris Lovin out of that, if you-all are good with that" (emphasis added).  From these statements, it is clear that Wife's attorney was aware that he was still "holding" at least $110,000.00 from the Clerk.  Furthermore, the record contains a receipt from the Clerk dated April 19, 2023 (the day Wife's attorneys made the foregoing announcements to the trial court).  The receipt, which is signed by Kendall Lewis, states that Kendall Lewis "received funds being held by the Clerk and Master, Williamson County Chancery Court, in the matter of Speranza v. Speranza. . . . I acknowledge the check I am signing for is made payable to Thomas Burton, PLLC, and I am said person or I have permission to obtain said funds for this person."

Based on the foregoing, it is disingenuous for Wife to assert that she was mistaken as to the amount of "all the cash [] in the clerk's office."  From our review, she received the full benefit of her bargain as announced by her attorney at the April 19th hearing.  As set out in context above, Ms. Story announced that Wife would receive "all the cash that's in the clerk's office."  At the time of the announcement, Wife was aware that payments to her attorneys had been ordered and were outstanding draws on the Clerk's account; likewise, the check from Heritage Title was an outstanding deposit to the Clerk's account.  Accordingly, "all the cash [] held in the clerk's office]" could only be the balance remaining in the account after the outstanding deposit and all outstanding debits cleared.  This is what Wife received in the Final Decree.

### E. Attorney's Fees

As noted above, both parties submitted proposed final decrees for the trial court's approval.  Although neither party orally announced an agreement concerning the enforcement of the decree, in their respective proposed decrees, both parties requested inclusion of the same language at paragraph 24, to-wit:

> 24. ENFORCEMENT. In the event that it becomes reasonably necessary for either party to institute or defend legal proceedings relating to contempt proceedings or for the enforcement of any provision of this Agreement, the successful party shall also be entitled to a judgment for reasonable expenses, including attorney's fees, incurred in connection with such proceedings.

The trial court included the requested language verbatim in its Final Decree.

The trial court denied Wife's Rule 59.04 motion, and, based on paragraph 24 of the Final Decree, *supra*, charged her with Husband's attorney's fees incurred in defending the unsuccessful motion. Wife does not dispute the amount of the attorney's fee awarded to Husband, only the award itself. However, having proposed the very language that forms the basis of the trial court's award, Wife is held to it. Husband was the successful party on the Rule 59.04 motion, and he was entitled to attorney's fees and costs under the plain language of paragraph 24 of the Final Decree.

Based on the foregoing analysis, we decline to reverse the trial court's denial of Wife's Rule 59.04 motion; as such, Husband is the prevailing party on appeal. Husband asks this Court to award him attorney's fees and costs incurred in defending the appeal. As the prevailing party, paragraph 24 of the Final Decree entitles Husband to his appellate attorney's fees and costs. Accordingly, Husband's motion is granted, and the case is remanded for determination of his reasonable appellate attorney's fees and entry of judgment on same.

## V. Conclusion

For the foregoing reasons, the trial court's order is affirmed. Husband's request for appellate attorney's fees is granted. The case is remanded for determination of Husband's reasonable appellate attorney's fees, for entry of judgment on same, and for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Kimberly Sue Speranza. Execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE

- 24 -